UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PAMELA HOLLEY,**

    **Plaintiff,**

  v.

**BBS/MENDOZA, LLC,**

    **Defendant.**

:

:

:

Case No. 2:23-cv-52
Judge Sarah D. Morrison
Magistrate Judge Elizabeth A. Preston Deavers

## OPINION AND ORDER

Pamela Holley filed suit against her former employer, BBS/Mendoza, LLC, for race discrimination and retaliation under Ohio law and Title VII; disability discrimination under Ohio law and the Americans with Disabilities Act; and interference with rights under the Family Medical Leave Act. (Compl., ECF No. 1.) BBS/Mendoza moves for summary judgment on all claims. (Mot., ECF No. 11.) Because BBS/Mendoza fails to establish that it is entitled to judgment as a matter of law, the Motion is **DENIED**.

**I.    BACKGROUND**

    **A.    The Parties**

Ms. Holley is an African-American woman who suffers from hypertension (high blood pressure). (Compl., ¶ 15; Holley Dep., ECF No. 14-3, 9:10.) BBS/Mendoza is a McDonald's franchisee with twenty restaurants in central Ohio. (Cuervo Aff., ECF No. 11-1, ¶ 2; ECF No. 14-1, PAGEID # 140.)

BBS/Mendoza hired Ms. Holley in January 2019. (ECF No. 15-2, PAGEID # 346.) For more than two and one-half years, Ms. Holley worked in the kitchen at BBS/Mendoza's Sinclair Road location. (Cuervo Aff., ¶ 4.) During that time, she never received written discipline. (ECF No. 15-2, PAGEID # 349.)

    **B.    During the Summer of 2021, Ms. Holley reported hearing derogatory language used against African American BBS/Mendoza employees.**

In March 2021, a white man named Brett Wilson became General Manager of the Sinclair Road location. (Cuervo Aff., ¶ 5.) Ms. Holley testified in deposition that, during the summer of 2021, she overheard someone in the kitchen derogatorily refer to an African-American colleague as "boy." (Holley Dep., 42:1–10.) Ms. Holley reported the incident to Mr. Wilson and his supervisor, BBS/Mendoza Operations Supervisor Steven Kunz. (*Id.*, 43:14–44:11; *see also* Kunz Dep., ECF No. 14-2, 9:13–16.) In her recollection, however, she "really didn't get a response." (Holley Dep., 44:12–13.) Around the same time, Ms. Holley also heard Mr. Wilson refer to his African-American colleagues as "you people" or "them people." (*Id.*, 42:13–19.) She testified that she told Mr. Kunz about this behavior, as well. (*Id.*, 54:20–55:7.) Mr. Kunz denies receiving any such reports. (Kunz Dep., 16:20–22.)

    **C.    On August 27, 2021, Ms. Holley and Mr. Wilson had a verbal altercation. It concluded with Mr. Wilson telling Ms. Holley she was "fired."**

On August 27, 2021, Ms. Holley reported to work at 4:00 a.m. (*Id.*, 6:7.) Within an hour of arriving, she started to experience hypertension symptoms. (*Id.*, 7:15.) She advised the shift manager, Yakaday Sankoh, who had just arrived. (*Id.*, 7:19–20.) Ms. Sankoh told Ms. Holley that she could not leave, but that she would

2

advise Mr. Wilson, who was the next manager scheduled to arrive. (*Id.*, 7:22–8:3.) Ms. Holley and Mr. Wilson disagree about what happened next.

In Ms. Holley's recollection, she told Mr. Wilson that she needed to leave because she was "seeing spots" and "was getting lightheaded and dizzy." (*Id.*, 21:1–2.) Mr. Wilson accused Ms. Holley of malingering—"trying to leave [him] here by [him]self," which would require him "to close down the lobby and only run drive-thru[.]" (*Id.*, 16:15–17.) He directed her to "take your A-S-S back there to that back drive-thru and run the drive-thru, you're not sick, you're just trying to leave me in here stuck." (*Id.*, 16:18–20.) When Ms. Holley began to leave despite Mr. Wilson's directive, the two "exchang[ed] words." (*Id.*, 21:8.) She testified:

> It was escalating. He was getting loud and I had got loud back and I was telling him that I'm not going to, I need to go to the emergency room, I need to go, I need to go, I need to go.
>
> And at that point in time there was a [customer] that was at the front counter that had said to me if you need me to say something then I will, because that person heard the whole conversation.

(*Id.*, 21:8–16.) As Ms. Holley left, Mr. Wilson told her she "was fired and not to come back to this store." (*Id.*, 33:20–21.)

Mr. Wilson gives a very different account. In his version, he arrived at the restaurant to find Ms. Holley over-stuffing cabinets in violation of food safety regulations. (Wilson Dep., ECF No. 14-1, 47:12–15.) After coaching her on the violation,

> [Ms. Holley] just told me that she was sick. I was under the impression that she had a communicable disease. She went to clock out and I said: Hey, what are you doing, at which point she told me she was sick and that she had notified another manager.

3

I went ahead and told her to clock out and leave. I was under the impression it was a communicable disease so I wrote up the shift manager that she told that she was sick hours previously for not sending her home.

At that point I told her that I was going to be talking to her about the performance issues that she had during the day because when I came in I had again re-trained her on some of the food safety violations that she was committing in the kitchen.

. . .

What I planned to do was talk to her at the end of her shift anyway. Since that was the end of her shift, I said: Hey, just heads up, we're going to have to talk about your performance, we're going to have a sit-down later about this.

She became agitated after that and went out to the lobby and started harassing a customer that was standing there.

. . .

She ran up to the customer and said give me your phone number and your name. The customer said: I don't know you. She said: No, I want you to write down your name and phone number; you're going to be a witness, at which point the customer said: Witness for what?

She said: No, no, no, just write it down, write down your info, and she kept sliding pen and paper toward him.

He's like: I don't want involvement in this. He left, at which point I told her you can't harass customers like that and now you're fired.

(*Id.*, 46:15–49:16.)

4

### D. Mr. Kunz disagreed with Mr. Wilson's decision—but it is unclear whether that was communicated to Ms. Holley.

The record also contains vastly different accounts of BBS/Mendoza's response to the August 27, 2021 incident. Mr. Kunz testified that he over-rode Mr. Wilson's termination of Ms. Holley and relayed as much to her that afternoon[1]:

> I think maybe we talked about the issues that she had. I think she said Brett is racist and I disagreed with her.
>
> I know I offered to move her to another restaurant. At the time COVID was in full swing. We were short everywhere. It led to short staffing everywhere.

(Kunz Dep., 26:9–15.) He recounted the conversation in an August 30, 2021 email to BBS/Mendoza management:

> I have spoken with Pam, Friday afternoon, where she first told me that Brett is racist. Never heard a peep from her about that until that phone call. She also told me she plans to sue the company, Brett, and myself for our racist behavior. I also told her she wasn't terminated and we felt that it was a misunderstanding that just escalated. And that I would be happy to find her a different store to work at, and suggested Clintonville, New Albany, or Maple Canyon.

(ECF No. 14-2, PAGEID # 236.)

Ms. Holley denies speaking with Mr. Kunz on August 27, 2021, and does not recall receiving an offer of continued employment with the company. (Holley Dep., 32:10–17.[2])

---

[1] It is unclear from the record whether this conversation took place on August 27, 2021, or August 28, 2021. (*Compare* ECF No. 11-1, PAGEID # 74 *and* ECF No. 14-2, PAGEID # 236.)

[2] BBS/Mendoza argues that Ms. Holley's post-deposition affidavit contradicts her deposition testimony on this point. (ECF No. 18, *generally*.) Paragraph 7 states:

> After I was terminated, I called Steven Kunz and told him about the incident. Kunz never said I could go back to work at the Sinclair road.

5

Meanwhile, in response to interrogatories asking that it identify (i) the people "who were part of the decision to terminate" Ms. Holley and (ii) the conduct on which BBS/Mendoza based its decision to terminate Ms. Holley, BBS/Mendoza stated that Ms. Holley was terminated on August 27, 2021, that Mr. Wilson was the sole decision-maker, and that "[t]he reason General Manager Wilson terminated [her] on August 27, 2021, was her harassment of a customer in the lobby after Mr. Wilson directed her to clock out." (ECF No. 14-2, PAGEID # 239–40.)

---

> Kunz never said I was not terminated. No other representatives of Defendant reached out to me to allow me to continue to work.

Holley Aff., ECF No. 15-1, ¶ 7. On this point, BBS/Mendoza points to Ms. Holley's deposition testimony:

> Q: Did [Kunz] say anything to you about perhaps moving to a different store and continuing to work?
> A: If he said that, I don't – I don't remember that because at the time I had so much that was going on I don't remember if he said that. . . .

Holley Dep., 34:10–35:4. There is undeniable tension between this testimony and the Affidavit. The Court will thus ignore that sentence of Ms. Holley's Affidavit. *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 842–43 (6th Cir. 2021) (explaining that the "sham affidavit" rule can apply "when the witness's affidavit is in tension with" prior deposition testimony and "the circumstances show that the party filed the affidavit merely to manufacture a sham fact issue") (internal quotations and citations omitted).

BBS/Mendoza next argues that Paragraph 7, Sentence 4 is contradicted by testimony in Cristina Cuervo's affidavit about text messages between Ms. Holley and Ms. Cuervo in September 2021. But BBS/Mendoza's counsel admits that those text messages were not produced in discovery because they "were not located by Defendant until after the close of discovery[.]" (ECF No. 18, PAGEID # 397.) It does not appear that BBS/Mendoza supplemented its discovery responses after locating the messages, *see* Fed. R. Civ. P. 26(e), and thus it cannot rely on the messages to support is Motion, s*ee* Fed. R. Civ. P. 37(c)(1).

6

Following the August 27, 2021 incident, Ms. Holley retained counsel and filed this lawsuit.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

7

### III. ANALYSIS

#### A. Race Discrimination and Retaliation

Ms. Holley brings race discrimination and retaliation claims under both state and federal law. *See* 42 U.S.C. §§ 2000e-2(a), 2000e-3(a); Ohio Rev. Code §§ 4112.02(A), (I). "[F]ederal case law interpreting Title VII of the Civil Rights Act of 1964, Section 2000e *et seq.*, Title 42, U.S. Code, is generally applicable to cases involving alleged violations of R.C. Chapter 4112." *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981); *Noble v. Brink Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004). The Court will thus analyze Ms. Holley's federal and state claims together.

Race discrimination and retaliation can be proven by either direct or circumstantial evidence. *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 n.5 (6th Cir. 2008), *cert. denied*, 129 S.Ct. 2380 (2009) (discrimination); *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) (retaliation). Because Ms. Holley relies on the latter, the Court will use the familiar *McDonnell Douglas* burden-shifting framework. *White*, 533 F.3d at 391 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Dept. of Comm. Affairs v. Burdine*, 451 U.S. 248 (1981)). Under that framework, a plaintiff must first establish a *prima facie* case of discrimination. *White*, 533 F.3d at 391. If she does, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for its actions. *Id.* Finally, if the defendant carries its burden, the plaintiff must prove that the proffered reason is pretextual. *Id.* at 392.

8

The Court need not undertake the complete *McDonnell Douglas* analysis, however, because BBS/Mendoza argues only that Ms. Holley did not suffer an adverse employment action. *See Hill v. Nicholson*, 383 F. App'x 503, 508–09, 512 (6th Cir. 2010) (defining "adverse employment action" as an element of a *prima facie* case for both discrimination and retaliation). BBS/Mendoza maintains that Ms. Holley "did not suffer an ultimate adverse employment action based on Mr. Wilson's statement during the August 27, 2021 incident" because Mr. Kunz over-rode the decision. (Mot., PAGEID # 60.) Instead, Ms. Holley "voluntarily quit despite [BBS/Mendoza's] offer to continue her employment and even transfer her to another restaurant." (*Id.*)

BBS/Mendoza does not contend with the contradictory evidence in the record. To begin, Ms. Holley did not recall being offered continued employment or a store transfer—and, as BBS/Mendoza's counsel pointed out, if Ms. Holley was "stressed about paying [her] bills," Mr. Kunz "saying [she] should continue to work . . . would have been something [she] would have recalled." (Holley Dep., 34: 21–24.) Further, BBS/Mendoza's own interrogatory responses state that Mr. Wilson terminated Ms. Holley on August 27, 2021, for "mistreating [a] customer." (ECF No. 14-2, PAGEID # 239.) There are genuine issues of material fact as to the date and reason for Ms. Holley's separation from employment.

BBS/Mendoza fails to establish that it is entitled to judgment as a matter of law on Ms. Holley's race discrimination (Counts I and II) and retaliation (Counts V and VI) claims. The Motion for Summary Judgment on those claims is **DENIED**.

9

## B. Disability Discrimination

BBS/Mendoza next moves for summary judgment on Ms. Holley's disability discrimination claims. Federal and state laws make it unlawful for an employer to discriminate against a qualified individual on the basis of disability. *See* 42 U.S.C. § 12112(a); Ohio Rev. Code § 4112.02(A). As above, the federal and state law claims are analyzed together. *See City of Columbus Civil Serv. Comm'n v. McGlone*, 82 Ohio St. 3d 569, 573 (1998); *Sandinsky v. EBCO Mfg. Co.*, 730 N.E.2d 395, 398 (Ohio App. 1999). To establish a *prima facie* case of disability discrimination, a plaintiff must show that "(1) he is disabled; (2) he is otherwise qualified for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) his employer knew or had reason to know of his disability; and (5) his position remained open." *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 449 (6th Cir. 1999) (citation omitted). BBS/Mendoza argues that Ms. Holley's claims fail on the third and fourth elements.

As to third element, BBS/Mendoza re-iterates its position that Ms. Holley did not suffer an adverse employment decision. The Court has already concluded that this poses a genuine issue of material fact.

As to the fourth element, BBS/Mendoza asserts that it was "never placed on actual notice" that Ms. Holley suffered from hypertension.[3] (Mot., PAGEID # 62.) The Sixth Circuit recently explained:

> "An employer has notice of the employee's disability when the employee tells the employer that [s]he is disabled." [*Hammon*, 165 F.3d at 450

---

[3] BBS/Mendoza does not dispute that Ms. Holley's hypertension constitutes a disability.

10

> (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)).] "Of course, the employee need not use the word 'disabled,' but the employer must know enough information about the employee's condition to conclude that [s]he is disabled." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 418 (6th Cir. 2016) (citing *Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007)). "Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Id.* (citing *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 737–38 (6th Cir. 2015)).

*King v. Steward Trumbull Mem'l Hosp., Inc.*, 30 F.4th 551, 563–64 (6th Cir. 2022). BBS/Mendoza notes that Ms. Holley's physician "never restricted her hours in any way nor recommended any workplace accommodations." (Mot., PAGEID # 61–62.) And Mr. Kunz and Mr. Wilson both testified that they were unaware of Ms. Holley's hypertension diagnosis. (Wilson Dep., 58:23–59:3; Kunz Dep., 34:1–5.) But Ms. Holley testified to specific instances in which she disclosed her hypertension to Mr. Kunz, Mr. Wilson, and Mr. Wilson's predecessors. (*See* Holley Dep., 10:4–14:17.) There is thus a dispute over whether BBS/Mendoza knew or should have known about Ms. Holley's disability. Resolving this dispute will require weighing the witnesses' relative credibility—and that is the exclusive province of the jury. *See Doe v. Clark Equip. Co.*, 187 F.3d 635 (6th Cir. 1999) ("Determining witness credibility is solely the province of the jury.").

BBS/Mendoza has not shown that it is entitled to judgment as a matter of law on Ms. Holley's disability discrimination claims (Counts III and IV). The Motion for Summary Judgment on those claims is **DENIED**.

11

### C. FMLA Interference

Finally, BBS/Mendoza seeks summary judgment on Ms. Holley's claim for interference with FMLA rights. To prevail on an FMLA interference claim, a plaintiff must establish:

> (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, . . . (5) the employer . . . interfered with the employee's FMLA benefits to which she was entitled[, and (6)] the employer's violation caused [the employee] harm.

*Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)) (original alterations omitted).

BBS/Mendoza concedes that Ms. Holley is an eligible employee and that it was an employer under the FMLA, but purports to dispute the final four elements. BBS/Mendoza's arguments are spartan, with no citations to record evidence or authority. (*See* Mot., PAGEID # 63.) Based on the record presently before the Court, Ms. Holley's FMLA interference claim faces an uphill battle. Nevertheless, BBS/Mendoza has failed to carry its burden of proving that it is entitled to judgment as a matter of law. The memorandum in support of its motion begs more questions than it answers on this claim. The Court declines to put flesh on those bones. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

BBS/Mendoza has not shown that it is entitled to judgment as a matter of law on Ms. Holley's FMLA interference claim (Count VII). The Motion for Summary Judgment on that claim is **DENIED**.

IV. **CONCLUSION**

BBS/Mendoza's Motion for Summary Judgment (ECF No. 11) is **DENIED**. This case will be set for trial under separate order.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**