UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**PAMELA HOLLEY,**

   **Plaintiff,**   :

 v.    Case No. 2:23-cv-52
      Chief Judge Sarah D. Morrison
      Magistrate Judge Elizabeth A.
      Preston Deavers

**BBS/MENDOZA, LLC,**   :

   **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Plaintiff Pamela Holley's Motion for Judgment Notwithstanding the Verdict, or in the Alternative, New Trial (Pl.'s Mot., ECF No. 54) on her Title VII retaliation and FMLA interference claims. The motion is fully briefed and ripe for consideration.

For the reasons below, the Motion is **DENIED**.

### I. THE EVIDENCE AT TRIAL

Ms. Holley's suit against her former employer, BBS/Mendoza, LLC, went to a jury trial on her claims for interference with her rights under the Family Medical Leave Act and Title VII retaliation, among other claims.

BBS/Mendoza is a McDonald's franchisee with several restaurants in central Ohio and Ms. Holley is a former BBS/Mendoza employee who suffers from hypertension (high blood pressure). She was told she was fired from BBS/Mendoza on August 27, 2021.

### A. Ms. Holley's Employment with BBS/Mendoza

In January 2019, Ms. Holley began working for BBS/Mendoza as a crew member at the company's Sinclair Road location. (Stip. Facts, ECF No. 38; Trial Tr. Vol. I, ECF No. 49, PAGEID # 749.)

Ms. Holley testified that her managers at BBS/Mendoza were aware of her hypertension and would allow her to take breaks during her shifts:

> Q: Were you taking your medication when you first began working at BBS/Mendoza?
>
> A: Yes, I was taking my medications, and I was going out, checking my blood pressure, and making sure that I was okay. But when I wasn't feeling okay, the managers would let me – managers would let me sit down and tell me to drink some orange juice, when I get myself together and I feel like I can work, to come back to work.

(Trial Tr. Vol. II, ECF No. 50, PAGEID # 1028.)

In particular, Ms. Holley testified that she told her shift manager Yakaday Sankoh about her hypertension when she began working at the Sinclair Road location. (*Id.* at PAGEID # 1029.) Ms. Holley also testified that, on at least one occasion, she gave the General Manager Brett Wilson a doctor's note for a day she had taken off work to go to an appointment for her hypertension.[1] (*Id.* at PAGEID # 1034.)

BBS/Mendoza's witnesses gave conflicting accounts of their knowledge of Ms. Holley's hypertension. HR Supervisor Cristina Cuervo testified that Ms. Holley's

---

[1] Ms. Holley did not provide copies of any doctor's notes and the Court sustained BBS/Mendoza's hearsay objection to Ms. Holley's testimony that the doctor's note said she was being seen for hypertension. (Trial Tr. Vol. II, PAGEID # 1034–35.)

prior manager let her take breaks for her symptoms and that the company was aware of Ms. Holley's hypertension on August 27, 2021. (*Id.* at PAGEID # 1004.) But Mr. Wilson denied knowing that Ms. Holley had high blood pressure and he testified that the only breaks she took were standard lunch breaks. (Trial Tr. Vol. I, PAGEID # 901; Trial Tr. Vol. II, PAGEID # 969.)

### B. The August 27, 2021 Incident

On August 27, 2021, Ms. Holley reported to work at 4:00 a.m. (Trial Tr. Vol. II, PAGEID # 1044.) Ms. Holley testified that, within an hour of arriving, she advised Ms. Sankoh that she wasn't feeling well:

> Q: Did you discuss with Yakaday what you needed to do when these symptoms occurred?
>
> A. Yes. Yes. I told her that -- well, let me just go back to that day of when everything occurred. When I opened up the door, when I got up in the morning, I was feeling fine. Later on, I opened up the door at 4:00, between 4:30 and 5:00, I started -- I seen purple dots floating, saliva in my mouth. You know, I proceeded to work, but I told Yakaday, and Yakaday say, when the next person come in, I will relieve you. Okay. So --
>
> \*\*\*
>
> Q: As the workday when on, how did you feel?
>
> A: I started feeling bad, and I had said something to Yakaday, that I wasn't feeling good because of my hypertension, and I had already talked to Yakaday about my hypertension. She was very aware of it, and she was telling me, when the next person come on, that I could go home.

(Trial Tr. Vol. II, PAGEID # 1030, 1045.) There was conflicting testimony about what happened next.

3

### 1. Ms. Holley's Testimony

Ms. Holley's testimony was that she told Mr. Wilson around 6:00 a.m. that she was "seeing purple dots floating, saliva in [her] mouth, and [she] was dizzy like." (*Id.* at PAGEID # 1045–46.) She explained to Mr. Wilson that her symptoms were due to her hypertension and that he was aware of her hypertension. (*Id.*) In response, Mr. Wilson said that there was nothing wrong with her and directed her to run the drive-thru window. (*Id.*) When Ms. Holley began to leave despite Mr. Wilson's directive, the situation escalated. She testified:

> Hold on. When he told me to take my black ass to the back and take a window, I told him that, no, I'm not. I'm going to the emergency room. I feel like I'm about to faint, and I feel like I'm about to pass out. I feel like I'm about to die here. No, I'm leaving. And then he was like no. He just kept getting belligerent with me, and then he was, like: You just trying to leave me here. You just trying to leave me stuck because you know ain't nobody – you know ain't nobody coming on. You are just trying to leave us stuck.

(*Id.* at PAGEID # 1047.)

According to Ms. Holley, a customer who had overheard her exchange with Mr. Wilson asked if she wanted his phone number because "the manager had … said something racist toward [her]." (*Id.* at PAGE ID # 1047.) Then, as she left the building, Mr. Wilson told her "you are fired." (Trial Tr. Vol. II, PAGEID # 1048.) Ms. Holley drove home and her husband took her to the emergency room. (*Id.* at PAGEID # 1048–49.)

4

The hospital took her blood pressure when she arrived and that it was high enough to have a stroke.[2] (*Id.* at PAGEID # 1050.)

### 2. Mr. Wilson's Testimony

Mr. Wilson gave a different account of the August 27 incident. He testified that he arrived at the restaurant to find Ms. Holley over-stuffing cabinets in violation of food safety regulations. (*Id.* at PAGEID # 939.) After Mr. Wilson coached her on the violation, she informed him she was sick and needed to leave:

> Q: Okay. Now, after mentioning that about the cabinets and needing to catch up, what was your next interaction with plaintiff?
>
> A: So, after I called back and said, hey, you still need to produce food, you can't just overstuff the cabinets, she just threw up her hands and said, I'm sick, I have to leave, went back, got her stuff, and then came up front.
>
> Q: Okay. When she came up front, did you speak to her?
>
> A: I asked where she was going because I wasn't sure what was happening. And then she was like, oh, I'm sick, I have to leave, and I said, oh, okay, I didn't know you were sick, and then she started to go out of the lobby, and I was, like, but we do need to talk about the cabinets. We're going to sit down and talk about this next week.
>
> Q: Did she say anything about Ms. Sankoh in that exchange about her being ill?
>
> A: Yeah. She did tell me that she had told Yakaday earlier that day that she felt sick and needed to leave.
>
> \*\*\*

---

[2] Ms. Holley's medical records reflect that her "screening blood pressure" was 161/96. (Pl.'s Ex. 10.) Her medical records also state that "[h]ypertension does not usually cause signs or symptoms" but that "[e]xtremely high blood pressure (hyperintensive crisis) may cause headache, anxiety, shortness of breath, and nosebleed." (*Id.*)

5

> Q: Okay. Now, you started to say what you -- after she told you she was leaving because she was sick, you started to say something else to her?
>
> A: I was like, hey, we still need to talk about this food safety issue from earlier. We're going to talk about this next week. My intention was to put her on a schedule with me the following week so that I could recoach and retrain on the cabinets.
>
> Q: Okay. And how did plaintiff respond to that?
>
> A: She got extremely agitated, very animated. She ran up to a customer in the lobby. She grabbed the pen and paper and shoved it and was, like, I want your name and phone number. The customer said, like, I don't want any part of this. I don't know what's going on. He did seem very clear that he just wanted to leave. So, I grabbed his food, got it to him, and he left. I told her to please leave him alone. He asked her to leave him alone.
>
> \*\*\*
>
> Q: At what point there did you tell her that she was fired? Was it before she said she would call the supervisors or after?
>
> A: She said it after. So, when I said, okay, now you are fired, because the customer was just done – I was like, okay you need to leave him alone, now you are fired. That's when she said, oh, I'm calling the supervisors and then left.

(*Id.* at PAGEID # 942–44.)

### C. Ms. Holley's April 2023 Application

As of December 11, 2022, Ms. Holley had accepted a higher paying permanent position at Abercrombie and Fitch. (Stip. Facts; Trial Tr. Vol I., PAGEID # 752.) Despite her job at Abercrombie, Ms. Holley started an application for a position at BBS/Mendoza in April 2023. (Pl.'s Ex. 8.)

BBS/Mendoza's HR Supervisor Cristina Cuervo testified that the "Capture Incomplete" status on Ms. Holley's application indicated that she did not "fully

6

present all information to move forward" through the automated application system. (Trial Tr. Vol. II, PAGEID # 1013.) Ms. Cuervo testified that Ms. Holley's application did not go forward because it was incomplete:

> Q. This is the last clarification on this. Regardless of whether you think the application is complete, you became aware that she applied. That's what you testified to?
>
> A. Yes. I became aware that she applied or engaged on our applicant tracking system, McHire.
>
> Q. And at that point Mendoza still didn't give her her job back?
>
> A. I don't believe she completed the application, sir, in order to move forward, so she wasn't at a place where she could -- where there was a full application to review, and it's an AI system that --
>
> Q. The moment you became aware that she applied, you had the ability to say … the moment you became aware that she applied, you had the ability to call the general manager at any store and say: "Hey, we have a former employee. We know who she is. We can hire her."
>
> A. I did not do that as I thought it would be a conflict of interest, since we are engaged in litigation.
>
> ***
>
> Q. You just indicated, and I want to confirm, the reason that she wasn't hired and you didn't talk to a manager about it is because of the litigation, because she engaged in litigation? You thought that would be a conflict?
>
> A. I don't -- I did think that would be a conflict, but I don't know that that's the reason she wasn't hired. She didn't complete the application fully at that point in time.
>
> ***
>
> Q. Okay. Now, in April of 2023, were you still in communication with plaintiff?

7

A. No. I was advised that the discussions were between counsel at that point in time.

Q. 'Cause of the pending litigation in this court?

A. Yes.

(Trial Tr. Vol. II, PAGEID # 1015–16, 1126.)

### D. Ms. Holley's Motions for Judgment as a Matter of Law

At the close of her case in chief, Ms. Holley moved for judgment as a matter of law[3] on her FMLA interference and Title VII retaliation claims,[4] which the Court took under advisement. (Trial Tr. Vol. II, PAGEID # 1111–15, 1146–53.) The Court denied both motions at the end of the trial. (Trial Tr. Vol. III, ECF No. 51, PAGEID # 1178–79.) The jury rendered a verdict for BBS/Mendoza on all of Ms. Holley's claims, which the Court then accepted and entered judgment for BBS/Mendoza and against Ms. Holley. (ECF No. 46.)

## II. LEGAL STANDARD

Judgment as a matter of law is appropriate when "viewing the evidence in the light most favorable to the non-moving party, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion, in

---

[3] The 1991 amendments of Fed. R. Civ. P. 50 replaced the terminology "directed verdict" and "judgment notwithstanding the verdict," or "JNOV," with the current terms "judgment as a matter of law" and "renewed judgment as a matter of law." Therefore, although the parties have used the terms "directed verdict" and "judgment notwithstanding the verdict" in their briefing, the Court will use the current terminology. *See Kusens v. Pascal Co.*, 448 F.3d 349, 358 n.10 (6th Cir. 2006).

[4] Ms. Holley also moved for judgment as a matter of law on her disability discrimination claim, but she has not renewed that motion here. (Trial Tr. Vol. II, PAGEID # 1146–53; Trial Tr. Vol. III, ECF No. 51, PAGEID # 1178–79.)

8

favor of the moving party." *Radvansky v. City of Olmsted Falls*, 496 F.3d 609, 614 (6th Cir. 2007) (quoting *Gray v. Toshiba Am. Consumer Prods., Inc.*, 263 F.3d 595, 598 (6th Cir. 2001). "The evidence should not be weighed, and the credibility of the witnesses should not be questioned." *Szekeres v. CSX Transp., Inc.*, 731 F.3d 592, 597 (6th Cir. 2013) (quoting *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005)). The Rule 50(b) motion should be granted only if reasonable minds could only come to the conclusion favoring the movant. *Id.*

A motion for a new trial may be granted if a court determines that the verdict is clearly against the weight of the evidence. *Denhof v. City of Grand Rapids*, 494 F.3d 534, 543 (6th Cir. 2007) (citing *J.C. Wyckoff & Assoc. v. Standard Fire Ins.*, 936 F.2d 1474, 1487 (6th Cir. 1991)). "The court is to accept the jury's verdict 'if it is one which reasonably could have been reached.'" *Id.* (quoting *Duncan v. Duncan*, 377 F.2d 49, 52 (6th Cir. 1967)).

### III. ANALYSIS

#### A. FMLA Interference

Ms. Holley had to establish the following elements to prevail on an FMLA interference claim: (1) she was eligible for leave under the FMLA; (2) she was entitled to take up to 12 weeks of leave in any 12-month period because of a serious health condition that made her unable to perform the functions of her position; (3) she gave BBS/Mendoza appropriate notice indicating when she required FMLA leave; and (4) BBS/Mendoza in any way interfered with, restrained, or denied her

9

entitlement to take time off from work.[5] (Trial Tr. Vol. III, PAGEID # 1274–75; Jury Instrs., ECF No. 44, PAGEID # 699.)

### 1. A reasonable jury could conclude that Ms. Holley was not entitled to FMLA leave.

An employee is entitled to FMLA leave for a "serious health condition that makes the employee unable to perform the functions of such employee." 29 U.S.C. § 2612(a)(1)(D). Leave may be taken intermittently "when medically necessary due to the serious health condition of … the employee[.]" 29 C.F.R. § 825.203.

BBS/Mendoza does not dispute that hypertension is a serious health condition; rather, they argue that a jury could have reasonably concluded that Ms. Holley was not entitled to FMLA leave on August 27, 2021, because there was evidence that her symptoms on that day were unrelated to her hypertension. (Def.'s Response, ECF No. 55, PAGEID # 1341.) Ms. Holley's briefing does not respond to BBS/Mendoza's argument on this point and treats the entitlement element as if it went undisputed at trial. Not so.

The only testimony at trial regarding her health condition on the day she was fired was Ms. Holley's. And while she testified that her symptoms on August 27 (purple dots, saliva) were symptoms of her hypertension, her medical records (Pl.'s Ex. 10) indicate that the symptoms of a hyperintensive crisis are headache, anxiety,

---

[5] The jury was also instructed that Ms. Holley could prevail on her FMLA interference claim by showing that BBS/Mendoza failed to reinstate her upon return from her FMLA leave but Ms. Holley's Motion does not argue that the jury should have found for her on this basis. (Trial Tr. Vol. III, PAGEID # 1275–76; Jury Instrs., ECF No. 44, PAGEID # 700.)

10

shortness of breath, and nosebleed—none of which Ms. Holley complained of on August 27. Her testimony that her blood pressure was over 200 when she went to the hospital that day was also not supported by her medical records. The records reflected only one screening blood pressure measurement of 161/96. (Pl.'s Ex. 10.)

While Mr. Wilson did not testify about her symptoms, he did testify about his interaction with Ms. Holley that day, including that she complained to him that she was ill only after he scolded her for violating food safety regulations.

Based on the evidence, a reasonable jury could have concluded Ms. Holley was not entitled to FMLA leave on August 27, 2021.

### 2. A reasonable jury could conclude Ms. Holley did not meet her burden of proof with regard to an alleged lack of a general FMLA notice.

The FMLA requires an employer with FMLA-eligible employees to provide its employees with "general notice" of the FMLA's provisions and procedures for filing FMLA complaints by posting the notice in a conspicuous place in the workplace and providing it to each employee, such as by including it in the employee handbook. 29 C.F.R. § 825.300(a).

Ms. Holley argues that BBS/Mendoza did not post the FMLA notice in the workplace. She was the only witness to testify about an FMLA poster in the breakroom.[6] When asked about it, she testified:

---

[6] Ms. Holley argues that Mr. Wilson testified on this point when he explained that "all of the information for the HR department and supervisors posted in [BBS/Mendoza's] breakrooms" included phone numbers, names, and emails for HR and Mr. Wilson's supervisor. (Pl.'s Reply, ECF No. 58, PAGEID # 1357 (citing Trial Tr. Vol. II, PAGEID # 961).) But Mr. Wilson never testified on whether there was an FMLA poster in the break room.

11

> Sir, to be honest, the numbers and stuff that you saying that is in the breakroom were not upon me getting there. The stuff was there, but after stuff start happening in the store, the numbers and stuff was removed, and numbers was scratched out. So, to be fair, the numbers wasn't there.

(Trial Tr. Vol. II, PAGEID # 1078.) Ms. Holley's testimony does not specify what "stuff" she is referring to or when that stuff was removed. Nothing in Ms. Holley's testimony required the jury to conclude that the FMLA poster was not in the breakroom.[7]

### 3. A reasonable jury could conclude that Ms. Holley failed to provide BBS/Mendoza with adequate notice of her FMLA leave.

When an employee requests FMLA leave, the employer must inform her of her eligibility for and rights under the FMLA. 29 C.F.R. § 825.300(b)-(d). To trigger this obligation, an employee must provide notice to her employer of her need to take FMLA leave "as soon as practicable under the facts and circumstances[.]" *Wallace v. FedEx Corp.*, 764 F.3d 571, 586 (6th Cir. 2014) (quoting 29 C.F.R. § 825.303(a)). While an employee does not have to expressly assert her rights under the FMLA, she must "provide enough information for the employer to know that the leave she has requested reasonably might fall under the FMLA." *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 872 (6th Cir. 2023). The information must be "reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman*

---

[7] Ms. Holley initially argued in her Motion that BBS/Mendoza also did not provide the required general FMLA notice in the employee handbook (Pl.'s Mot, PAGEID # 1324), but she conceded in her Reply that the handbook contained the general FMLA language (Pl.'s Reply, ECF No. 58, PAGEID # 1357).

*v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004). If the employer does not have enough information about the reason for an employee's use of leave, the employer "'should inquire further to ascertain whether the employee's leave was potentially FMLA-qualifying.'"[8] *Milman*, 58 F.4th at 872 (quoting *Nawrocki v. United Methodist Ret. Cmtys. Inc.*, 174 F. App'x 334, 338 (6th Cir. 2006)).

Ms. Holley argues that evidence at trial established that BBS/Mendoza's obligation to inform her of her FMLA rights or inquire further was triggered during three circumstances: (i) every time she informed her supervisors of her need to step away for her hypertension symptoms; (ii) when she took days off work for doctor's appointments; and (iii) when she spoke to Ms. Sankoh on August 27, 2021.[9] (Pl.'s

---

[8] Ms. Holley states in her Motion that the Court "denied [her] requested inclusion of a jury instruction setting forth the obligations of employers to provide notice regarding FMLA right (sic) relative to her FMLA interference claim." (Pl.'s Mot., PAGEID # 1315–16.) The Court denied Ms. Holley's request because the instructions that were ultimately read to the jury fully addressed the concepts in Ms. Holley's desired additional instruction. (Trial Tr. Vol. III, ECF No. 51, PAGEID # 1172.) The jury was instructed in relevant part:

> Holley is not required to use the "magic words" when requesting FMLA leave. To invoke the protection of the FMLA, an employee must provide notice and a qualifying reason for requesting the leave. Moreover, the employee need not expressly assert rights under the FMLA or even mention the FMLA, but may only state that leave is needed. The employer will be expected to obtain any additional required information through informal means. The employee's burden is not heavy.

(*Id.* at PAGEID # 1275; Jury Instrs., ECF No. 44, PAGEID # 699.)

[9] Ms. Holley argues that BBS/Mendoza "stipulated that it failed to provide proper FMLA notice on August 21, 2001 (sic)[.]" (Pl.'s Mot., PAGEID # 1307.) But BBS/Mendoza stipulated only that it "failed to advise Holley of her rights under the FMLA on August 27, 2021[,]" not that its FMLA duty to inform or inquire had been triggered that day. (ECF No. 38-1.)

13

Mot., PAGEID # 1323.) Her argument fails because a jury could reasonably find that BBS/Mendoza's obligations were not triggered in any of these three circumstances.

First, there was conflicting testimony regarding Ms. Holley's breaks. While Ms. Holley's and Ms. Cuervo's testimony suggested that at least some of Ms. Holley's managers allowed her to take breaks for her hypertension symptoms, none of these managers were called to testify and there was no evidence of specific dates that she took these breaks or other context on which a jury could find BBS/Mendoza's duty was triggered. And Mr. Wilson, the only manager called to testify in this case, testified that Ms. Holley took only her standard lunch breaks.

Second, while Ms. Holley testified that she took days off work to attend doctor's appointments for her hypertension and that she provided a doctor's note to Mr. Wilson for at least one of these days, no doctor's notes were admitted into evidence and Mr. Wilson testified that he did not know Ms. Holley had hypertension.

Finally, Ms. Holley argues that BBS/Mendoza's duty was triggered on August 27, 2021, because she told Ms. Sankoh that "she needed to go to the hospital for immediate medical care." (Pl.'s Mot., PAGEID # 1323 (citing Trial Tr. Vol. I, PAGEID # 901).) But Ms. Holley's own account of what she told Ms. Sankoh is that she told Ms. Sankoh that she "wasn't feeling good because of [her] hypertension" and that she was experiencing purple dots floating in her vision and saliva in her

14

mouth, but that she did not ask to leave work at that time. (Trial Tr. Vol. II, PAGEID # 1030, 1045.)

Thus, for each of the three circumstances, a reasonable jury could (and did) resolve the disputed facts in BBS/Mendoza's favor.

Because a reasonable jury could have found that BBS/Mendoza did not interfere with Ms. Holley's FMLA rights, the Court **DENIES** her Motion as to her FMLA Interference claim.

### B. Title VII Retaliation

Ms. Holley argues that BBS/Mendoza retaliated against her for bringing this case when it did not consider her April 2023 application for re-hire. Retaliation claims require the plaintiff to show that her protected activity was a but-for cause of the alleged adverse action.

Ms. Holley asserts that Ms. Cuervo's testimony that she thought it would be a "conflict of interest" to reach out to Ms. Holley about her April 2023 job application with BBS/Mendoza is "a clear and explicit admission of retaliatory intent." (Pl.'s Mot., PAGEID # 1319.) To advance this argument, Ms. Holley asks the Court to focus on cherry-picked portions of Ms. Cuervo's testimony, ignoring its context. But Ms. Holley's application was incomplete and the question Ms. Cuervo was responding to was very different than whether she would re-hire Ms. Holley—Ms. Cuervo was asked whether she called any manager and told them to hire Ms. Holley.

A reasonable jury could have concluded that Ms. Holley's pursuit of this litigation was not the but-for cause of BBS/Mendoza's decision not to re-hire her—her application was incomplete.

Because a reasonable jury could find that BBS/Mendoza did not retaliate against Ms. Holley, the Court **DENIES** her Motion as to her Title VII Retaliation claim.

## IV. CONCLUSION

Ms. Holley's Motion for Judgment Notwithstanding the Verdict, or in the Alternative, New Trial (ECF No. 54) is **DENIED**.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**